UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CYNTHIA L. BAKER,

             Plaintiff,

        v.

CITY OF SEATAC, et al.,

             Defendant.

CASE NO. C12-1985JLR

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

## I.    INTRODUCTION

Before the court are Plaintiff Cynthia Baker's motion for partial summary
judgment (Plf. Mot. (Dkt. # 53)) and Defendants City of SeaTac's ("City") and Todd
Cutt's motion for summary judgment ((Def. Mot. (Dkt. # 50)).  Having considered the
submissions of the parties, the balance of the record, and the relevant law, and no party
having requested oral argument, the court grants in part and denies in part Defendants'
motion for summary judgment and grants in part and denies in part Plaintiff's motion for
summary judgment.

## II.  FACTS

The City hired Ms. Baker as Community and Economic Development Department Director in February, 2011.  (*See* Hoang Dep. (Dkt. # 54-1) at 5.)  Ms. Baker received on offer letter signed by City Manager Mr. Cutts on February 1, 2011, which she accepted on February 3, 2011.  (Offer Letter (Dkt. 52-1).)  The offer letter describes Ms. Baker's position as a "regular, full-time" employee of the City.  (*Id.* at 2.)  Ms. Baker states that when she read the offer letter, she was "surprised" that it did not state that she was an "at-will" employee.  (Baker Dep. (Dkt. # 51-1) at 3, 4.)  Ms. Baker claims that when she mentioned to the City's Human Resources Director, Anh Hoang, "Oh, this [offer letter] doesn't have anything in here about at-will," Ms. Hoang responded:  "We're not an at-will city."  (*Id.*)  Ms. Baker testified at deposition that she concluded she was a for-cause employee because of the offer letter and Ms. Hoang's statement.  (*Id.* at 5.)

At the time Ms. Baker was hired, the City maintained an employee handbook ("the Handbook").  (*See* Handbook (Dkt. # 35-1).)  Ms. Baker acknowledged that she received a copy of the Handbook at her orientation meeting on February 23, 2011.  (Receipt (Dkt. # 52-2); *see also* Orientation Checklist (Dkt. 54-1).)  The Handbook stated:

> The City may end its employment relationship with its regular, part-time, and full-time employees for cause, including but not limited to those listed in the *Standards of Conduct & Discipline* section.  The City may end its employment relationship with its temporary, seasonal, and probationary employees at any time and for any reason.

(Handbook at 4.)  The Handbook also stated that it was "intended to be a source of general information concerning City personnel policies and procedures" and that it "sets out basic personnel policy and procedural guidelines for those . . . working in the City."

(*Id.* at 3.)  Ms. Baker asserts that although she read the Handbook when she was first hired, the sentence about termination for cause "did not stand out" to her.  (Baker Dep. at 5.)

In February, 2012, after concerns arose regarding Ms. Baker's management style, Mr. Cutts authorized an investigation by Ms. Hoang.  (Cutts Dec. (Dkt. # 32) ¶ 3.)  Over the next five months, Ms. Hoang interviewed numerous employees who reported to Ms. Baker and reviewed relevant personnel files and documents.  (Hoang Dec. (Dkt. 33-1) Ex. 1 (Report) at 6-7.)

Ms. Hoang also interviewed Ms. Baker nine times, for a total of over 25 hours. (*Id.* at 7.)  City Manager Mr. Cutts attended many of Ms. Baker's interviews.  (Cutts Dec. ¶ 5.)  City Attorney Mary Bartolo attended five.  (Bartolo Dec. (Dkt. # 31) ¶ 2.)  The City did not permit Ms. Baker's attorney, Mr. Rosen, to attend any of her interviews.  (Baker Dec. ¶ 13.)   Instead, Ms. Baker received audio recordings of her interviews, as well as "interview notes" from other employees' interviews.  (Bartolo Dec. ¶¶ 3-6.)

As the investigation continued, Mr. Cutts placed Ms. Baker on administrative leave on April 13, 2012.  (Baker Dec. ¶ 10.)  Ms. Hoang drafted a 48-page Personnel Investigation Report ("Report") summarizing the results of her investigation.[1]  (*See* Report.)   In the Report, Ms. Hoang concluded that Ms. Baker "has not demonstrated that she has this [sic] combination of skills to effectively lead this department."  (*Id.*)  On July

---

[1] Ms. Hoang's report contains hearsay statements by third-party city employees. *See* Fed. R. Evid. 801, 802.  The court considers this document not for the truth of these statements, but rather as evidence of the scope of the investigation that Ms. Hoang conducted.

17, 2012, Ms. Baker received a copy of the Report in conjunction with a "Pre-disciplinary Hearing Notice" ("Hearing Notice"). (*See* Cutts Dec. Ex. 13 (Hearing Notice).)

The Hearing Notice identified specific "Allegations of Misconduct" and listed Ms. Baker's "Alleged Violations" of the City's employee handbook and other policies. (*Id.*) The Hearing Notice gave Ms. Baker only two days to respond, setting a hearing date for July 19, 2012. (*Id.* at 1.) At the request of Ms. Baker's attorney, the hearing was delayed until July 30, 2012. (Resp. (Dkt. # 34) at 8.) In the interim, Ms. Baker provided the City a 19-page written response. (*See* Cutts Dec. Ex. 14.)

On July 30, 2012, Ms. Baker and Mr. Rosen attended a telephonic hearing with City employees Mr. Cutts, Ms. Bartolo, and Ms. Hoang. (Cutts Dec. ¶ 10.) On this telephone call, Ms. Baker requested and was granted an opportunity to submit a supplemental response. (Cutts Dec. ¶ 11.) On August 7, 2012, Ms. Baker hand-delivered to Ms. Bartolo an eight-page response that included almost 200 pages of attachments. (*See* Bartolo Dec. Ex. 1.) Mr. Cutts admits that he did not read the attachments to Ms. Baker's response. (Cutts Dep. (Dkt. # 54-2) at 6-7.) Nonetheless, the very next day, Mr. Cutts emailed Ms. Baker a "Notice of Discipline – Termination" ("Termination Notice") indicating that he had decided to terminate her employment, effective immediately. (*See* Cutts Dec. Ex. 15 (Termination Notice) at 5.)

Mr. Rosen wrote two letters to the City requesting a post-termination hearing for Ms. Baker. (*See* Rosen Dec. Ex. 1). The City denied these requests. (*See* Bartolo Dec. Ex. 2.)

After the City denied Ms. Baker a post-termination hearing, Ms. Baker filed this suit. (*See generally* Compl. (Dkt. # 1).) Ms. Baker alleges (1) a 42 U.S.C. § 1983 claim for violation of her procedural due process rights under the Fourteenth Amendment of the United States Constitution and (2) wrongful discharge under Washington law.[2] The court denied the Defendants' previous motion for summary judgment that Ms. Baker (assuming she possessed a property interest in her employment) was not entitled to a post-termination hearing. (*See* 10/22/13 Am. Ord. (Dkt. # 43).)

The Defendants now bring a motion for summary judgment that Ms. Baker did not possess a property interest in her employment and that Mr. Cutts is entitled to qualified immunity. (Def. Mot. at 7-9.) Ms. Baker brings her own motion for partial summary judgment that she was denied due process because she did not receive a post-termination hearing. (Plf. Mot. at 1.)

## III.    ANALYSIS

### A.    Summary Judgment Standard

Federal Rule of Civil Procedure 56 permits a court to grant summary judgment where the moving party demonstrates (1) the absence of a genuine issue of material fact and (2) entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007). The

---

[2] Ms. Baker voluntarily dismissed her claims under the Washington constitution and against the city council members in their official capacities. (2/11/13 Notice (Dkt. # 24) at 1.) The court dismissed Ms. Baker's claims against the city council members in their individual capacities. (3/5/13 Order (Dkt. # 26).)

1  moving party bears the initial burden of production of showing an absence of a genuine

2  issue of material fact.  *Celotex*, 477 U.S. at 323.

3      If the moving party does not bear the ultimate burden of persuasion at trial, it can

4  show an absence of issue of material fact in two ways: (1) by producing evidence

5  negating an essential element of the nonmoving party's case, or, (2) showing that the

6  nonmoving party lacks evidence of an essential element of its claim or defense.  *Nissan*

7  *Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).  If

8  the moving party will bear the ultimate burden of persuasion at trial, it must establish a

9  prima facie showing in support of its position on that issue.  *UA Local 343 v. Nor-Cal*

10 *Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994).  That is, the moving party must

11 present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.

12 *Id*. at 1473.

13      If the moving party meets its burden of production, the burden then shifts to the

14 non-moving party to designate specific facts demonstrating the existence of genuine

15 issues for trial.  *Celotex*, 477 U.S. at 324.  The non-moving party "may not rest upon the

16 mere allegations or denials of the [nonmoving] party's pleading," but must provide

17 affidavits or other sources of evidence that "set forth specific facts showing that there is a

18 genuine issue for trial" from which a factfinder could reasonably find in the non-moving

19 party's favor.  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252

20 (1986).  In determining whether the factfinder could reasonably find in the non-moving

21 party's favor, "the court must draw all reasonable inferences in favor of the nonmoving

22 party."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## B.    Property Interest

The Fourteenth Amendment protects individuals against the deprivation of property by the government without due process. *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993). A procedural due process claim under section 1983 has two elements: "(1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 982 (9th Cir. 1998).

As to the first element, a government employee has a constitutionally protected property interest in continued employment when the employee has a reasonable expectation or a "legitimate claim of entitlement" to the job. *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 475 (9th Cir. 1991), *quoting Bd. of Regents v. Roth,* 408 U.S. 564, 577 (1972). To determine whether an entitlement exists, a court looks to "existing rules and understandings that stem from an outside source such as state law." *Id*., *quoting Roth,* 408 U.S. at 577; *see also Portman*, 995 F.2d at 904. The property interests subject to procedural due process protection "are not limited by a few rigid, technical forms." *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). Rather, a person's interest "is a property interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement." *Id.*

Accordingly, a "state law which limits the grounds upon which an employee may be discharged, such as conditioning dismissal on a finding of cause, creates a constitutionally protected property interest." *Dyack v. Commonwealth of N. Mariana Islands*, 317 F.3d 1030, 1033 (9th Cir. 2003), quoting *Brady v. Gebbie,* 859 F.2d 1543,

1548 (9th Cir. 1988).  On the other side of the spectrum, "[i]f, under state law, employment is at-will, then the claimant has no property interest in the job." *Portman*, 995 F.2d at 904; *see also Dyack*, 317 F.3d at 1033; *Bishop v. Wood*, 426 U.S. 341, 346 (1976) (ruling that an at-will government employee lacked a property interest for the purposes of due process protection).

## 1.  Washington Employment Law

"Absent a contract to the contrary, Washington employees are generally terminable at will." *Danny v. Laidlaw Transit Servs., Inc.*, 193 P.3d 128, 131 (Wash. 2008) (en banc).  In the same vein, an employment contract that is indefinite as to duration is generally terminable at will by both the employee and employer. *Roberts v. ARCO*, 568 P.2d 764, 768 (Wash. 1977) (en banc).  An at-will employee "may quit or be fired for any reason." *Danny*, 193 P.3d at 131.

There exist a number of exceptions to the background rule of at-will employment. Washington courts have long held that a contract is terminable by the employer only for cause if "(1) there is an implied agreement to that effect or (2) the employee gives consideration in addition to the contemplated service."  *Roberts*, 568 P.2d 769. Additionally, (3) promises found in an employee manual issued by an employer can obligate the employer to act in accord with those promises.  *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1089 (Wash. 1984) (en banc).  Finally, (4) an employer can be liable if she discharges an employee for a reason that contravenes public policy.  *Id.*

Only the third exception (promises found in an employee manual) is at issue here. (*See* Plf. Resp. (Dkt. # 57) at 7-13.)  There are two avenues for a plaintiff to establish an

exception predicated on an employee manual. *Thompson*, 685 P.2d at 1087. First, "[a]n employee and employer can contractually obligate themselves concerning provisions found in an employee policy manual and thereby contractually modify the terminable at will relationship." *Id.* Under this approach, "the requisites of contract formation, offer, acceptance and consideration are necessary predicates to establishing that policies in an employment manual are part of the employees' original employment contract or part of the employment contract as modified by the parties." *Id.*

Alternatively, independent of the contractual analysis, employers may still "be obligated to act in accordance with policies as announced in handbooks issued to their employees." *Id.* Specifically, "if an employer . . . creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship." *Id.* (emphasis in original).

However, statements made in employee handbooks are not binding if the employer provides an appropriate written disclaimer. *Thompson*, 685 P.2d at 1088 (stating that employers "can specifically state in a conspicuous manner that nothing contained [in a handbook] is intended to be part of the employment relationship and are simply general statements of company policy"). *Id.*

### 2. Effect of Employee Handbook on Ms. Baker's Employment Status

Ms. Baker's employment with the City was, by statute, indefinite as to duration. *See* RCW 35A.13.110. And Ms. Baker's offer letter from the City did not specify

whether she was a for-cause or at-will employee. (Offer Letter.) Without more, Ms. Baker would be considered an at-will employee under Washington law, and as a result could advance neither a § 1983 claim nor a claim for wrongful discharge.

Ms. Baker, however, argues that the City's employee handbook guaranteed that she could only be fired for cause. (*See* Plf. Resp. at 7-13.) The two distinct avenues of this argument— contract and promissory estoppel—are addressed fully below. Before reaching that analysis, it is first necessary to address the Defendants' two overarching responses that (1) the language of the Handbook does not convey for-cause status and (2) to the extent that the Handbook does convey for-cause status, such a promise is "in direct violation of existing statutes" and therefore void. (Def. Mot. at 7; Def. Reply (Dkt. # 63) at 5.)

### a. Interpretation of the handbook

The interpretation of a writing is a question of law for the court. *Stewart v. Chevron Chem. Co.*, 762 P.2d 1143, 1145 (Wash. 1988) (en banc); *see also Swanson v. Liquid Air Corp.*, 826 P.2d 664, 668 (Wash. 1992) (en banc).

The City's Handbook stated:

> The City may end its employment relationship with its regular, part-time, and full-time employees for cause, including but not limited to those listed in the *Standards of Conduct & Discipline* section. The City may end its employment relationship with its temporary, seasonal, and probationary employees at any time and for any reason.

(Handbook at 4.) The City argues that the use of the word "may" in the first sentence of the provision means that this sentence constitutes merely a non-exclusive list of the reasons the City can end the employment of regular employees—the word "may"

describes a subset of, but does not limit, the City's options in that regard. (Def. Mot. at 7.) Consequently, the employment of regular employees remained at-will. The City's theory, however, does not explain why the provision's second sentence lists different, additional options for ending the employment of temporary employees.

Ms. Baker argues that the two sentences, read together, are intended to draw a distinction between the two different scenarios they describe: ending the employment of regular versus ending the employment of temporary employees. Under this interpretation, the City's options for ending employment for each set of employees is limited to the options described in the corresponding sentence. Accordingly, regular employees could only be fired "for cause, including but not limited to those listed in the Standards of Conduct & Discipline Section." (Handbook at 4.)

Because both of these interpretations are plausible, the court finds that the Handbook's provision is ambiguous. *See Ladum v. Util. Cartage, Inc.*, 411 P.2d 868, 872-73 (1966) (defining "ambiguous" as "capable of being understood in either of two or more possible senses" and as "an uncertainty of meaning in the terms of a written instrument"). Ordinarily, ambiguities are resolved against the drafter of a document. *Felton v. Menan Starch Co.*, 405 P.2d 585, 588 (Wash. 1965); *see also Adler v. Fred Lind Manor*, 103 P.3d 773, 786 (Wash. 2004). As such, the court construes the ambiguity against the City, and concludes that the Handbook established for-cause employment for "regular, part-time, and full-time employees" of the City. (Handbook at 4.) Because Ms. Baker's offer letter describes her as a "regular, full-time" City employee, this provision applies to her employment. (*See* Offer Letter at 2.)

### b. Municipal code

The court already denied Defendants' motion to amend their answer to add the defense of ultra vires.  (*See* 10/30/2013 Order (Dkt. # 47).)  To the extent Defendants' argument regarding the City's authority under the municipal code is still cognizable in light of that ruling, it nonetheless fails on the merits.

SeaTac is a noncharter code city with a council-manager form of government operating under Optional Municipal Code Title 35A RCW.  (Def. Mot. at 2.)  Municipal corporations such as SeaTac "have only such powers as are expressly granted to them and those necessarily implied to enable the corporation to carry out the powers expressly granted."  *Granite Falls Library Capital Facility Area v. Taxpayers of Granite Falls Library Capital Facility Area*, 953 P.2d 1150, 1154 (Wash. 1998).

According to section 35.A.13.080 of the Municipal Code:

> The powers and duties of the city manager shall be: . . .
> (2) To appoint and remove at any time all department heads, officers, and employees of the code city, except members of the council, and subject to the provisions of any applicable law, rule, or regulation relating to civil service . . . .

RCW 35.A.13.080. Section 35A.13.100 reiterates that:

> Any officer or employee who may be appointed by the city manager . . . may be removed by the manager or other such appointing officer at any time subject to any applicable law, rule, or regulation relating to civil service.

RCW 35A.13.100.  Finally, section 35A.13.110 provides in part:

> All such appointments [made by the city manager] shall be without definite term.

RCW 35A.13.110.

In support of their argument that SeaTac's city manager cannot grant for-cause employment, Defendants also rely on *Arbogast v. Town of Westport*, 567 P.2d 244 (Wash. Ct. App. 1977).[3] In *Arbogast*, the court found that a mayor's promise which purported to grant permanent status to a city employee prior to completion of a 1-year probation period required by a city ordinance was ultra vires and void. *Id.* at 246.

The City's argument is unavailing because—unlike the mayor in *Arbogast*—the city manager's action of promulgating the Handbook at issue does not violate any state statute or city ordinance. Specifically, since there is no dispute that Ms. Baker's employment was without definite term, RCW 35A.13.110 is satisfied.

Turning to RCW 35.A.13.080 and 35.A.13.100, the City explicitly authorized the city manager to establish personnel policies and to promulgate a handbook implementing such policies. City Ordinance No. 93-1030 provides:

> The City Manager shall have the authority to administer personnel matters of the City, and is authorized to promulgate and implement personnel rules and regulations, administrative policies, manuals, or directives including, but not limited to, those necessary to implement the provisions of this ordinance . . . and address other personnel and employee matters of the City.

Ordinance No. 93-1030, codified at SeaTac Municipal Code § 2.65.010. The mere fact that the city manager is granted the power to remove city employees "at any time" does not mean that the city manager does not retain discretion to decide when to exercise—and when to decline to exercise—that power. Whereas it would certainly be improper for a

_____

[3] Defendants also cite an unpublished Ninth Circuit opinion which issued before January 1, 2007. Based on Circuit Rule 36-3, the court does not cite or consider that opinion. *See* Fed. R. App. P. 36-3.

city manager to attempt to exercise *more* power than is granted him, the converse is not true. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 511 (1996) ("[G]reater powers include lesser ones."); *Delta Air Lines, Inc. v. August*, 450 U.S. 346, 368 (1981) (invoking "the common-sense maxim that the greater includes the lesser").

Moreover, "[t]he general grant of municipal power conferred by [Title RCW 35A] on legislative bodies of noncharter code cities and charter code cities is intended to confer the greatest power of local self-government consistent with the Constitution of this state and shall be construed liberally in favor of such cities."[4] RCW 35A.11.050. The City cites no authority for the proposition that Title RCW 35A's grant of power also forbids a city from choosing to exercise less than the "greatest power of local self-government" in every instance.

A decision by SeaTac's city manager to limit removal of certain personnel does not violate the statute authorizing him to "appoint and remove [employees] at any time" for the simple reason that, at the end of the day, the city manager still retains that authority. Statutes such as RCW35A.13.080 and RCW35A.13.100 constitute one-time grants of municipal power, the validity of which is not vitiated by the commitment of a city manager to forbear from exercising that power. After all, SeaTac's city manager can reassert the ability to remove employees "at any time" simply by issuing a new handbook or by inserting appropriate terms in a written agreement. *See Gaglidari v. Denny's*

---

[4] Under a council-manager plan of government such as SeaTac employs, the city's legislative body of elected councilmembers appoints a city manager to head the administrative branch of the government. *See* RCW 35A.13.010.

ORDER- 14

*Restaurants, Inc.*, 815 P.2d 1362, 1367 (1991) ("An employer may, without an express reservation of the right to do so, unilaterally change its written policy from one of discharge for cause to one of termination at will . . . ."). Therefore, the court rejects the City's argument that any promise of for-cause employment in the Handbook would violate state law or otherwise exceed the authority of the city manager.[5]

### c. Promissory estoppel

Under the promissory estoppel exception to at-will employment, an "employee seeking to enforce promises that an employer made in an employee handbook must prove: (1) whether any statements therein amounted to promises of specific treatment in specific situations; (2) if so, whether the employee justifiably relied on any of these promises . . . ." *Bulman v. Safeway, Inc.*, 27 P.3d 1172, 1174-75 (2001) (en banc).

Concerning the second element, an employee justifiably relies on a promise if she "is induced thereby to remain on the job and not actively seek other employment." *Thompson*, 685 P.2d at 1088. The employee must show reliance on the specific provision at issue—"it is *not enough* for a plaintiff in a wrongful discharge case to simply be able to rely upon the general *atmosphere* of his or her work place." *Bulman*, 27 P.3d at 1176 (emphasis in original) (overturning jury verdict because plaintiff "clearly failed to demonstrate any pretermination familiarity with the promises" contained in those

---

[5] The court's assessment might be different if the handbook was an attempt by a separate branch of city government to limit the power of the city manager, or if the effect of a city manager's policies was to contravene a statute setting forth the rights of employees (as opposed to a statute setting the forth the powers of the city manager). As it stands, the court can find no reason why the city manager should not be permitted to refrain from to exercising her removal power to its fullest extent in certain situations.

manuals); *see also Stewart v. Chevron Chem. Co.*, 762 P.2d 1143, 1146 (Wash. 1988) (en

banc) (finding no reliance because "[t]here is no evidence . . . that [the plaintiff] was

aware of the company's layoff policy until after he was discharged"). Whether a plaintiff

justifiably relied upon any promises in the handbook is a question of fact. *Swanson*, 826

P.2d at 671.

Assuming that the statement in the Handbook constitutes the requisite "promise of

specific treatment in specific circumstances," Ms. Baker has failed to raise sufficient facts

on the issue of reliance to merit continuing to trial on this exception. Ms. Baker testified

at deposition that she did not remember whether there was anything in the Handbook that

led her to believe she was a for-cause employee. (Baker Dep. at 4.) She claims she read

the Handbook but "couldn't have told you details of what it said." (*Id.*; *see also id.* at 5.)

The court in *Bulman* overturned a jury verdict because the plaintiff presented equivocal

evidence about whether he was familiar with the relevant handbook provisions prior to

his termination. *See Bulman*, 27 P.3d at 1178 (declining to view plaintiff's testimony that

he had "probably" seen one company manual and may have read but "hadn't memorized"

another manual as evidence that plaintiff was aware of the provisions in the manuals).

Ms. Baker's testimony concerning her awareness of the for-cause provision in the

Handbook is similarly insufficient.

Ms. Baker additionally claims that she "concluded she was a for-cause employee

because of the offer letter and Anh Hoang's representations to [her.]" (Baker Dep. at 5.)

Ms. Baker based her conclusion on the absence of at-will language in the offer letter. (*Id.*

at 3.) But an offer letter does not need to specify at-will employment in order for at-will

employment to apply. *See Havens v. C & D Plastics, Inc.*, 876 P.2d 435, 444 (Wash. 1994) ("Plaintiff says Defendants never told Plaintiff his employment would be terminable at will. However, terminable at will is the general rule, not the exception.") And courts have consistently held that oral representations by an employee's supervisor alone are insufficient to establish an enforceable promise.[6] *Lawson v. Boeing Co.,* 792 P.2d 545, 548 (Wash. Ct. App. 1990); *Winspear v. Boeing Co.*, 880 P.2d 1010, 1016 (Wash. Ct. App. 1994).

But even if Ms. Baker was entitled to rely solely on Ms. Hoang's representation, Ms. Baker has failed to present sufficient facts showing that she did, in fact, rely on it. An employee relies on a promise if she "is induced thereby to remain on the job and not actively seek other employment." *Thompson*, 685 P.2d at 1088. Reliance, in other words, means a change in position based on the promise. *Havens*, 876 P.2d at 443-44 (quoting (Second) Restatement of Contracts § 90 (1981)). Ms. Baker presents evidence that she remained on her job, but no evidence that she remained on the job *due to her belief* (however arrived at) that she was a for-cause employee. Courts have found such evidence incomplete as a matter of law. *See Kimbro v. Atl. Richfield Co.*, 889 F.2d 869,

---

[6] The court notes that Ms. Baker's situation somewhat differs from the situations at issue in those cases because Ms. Hoang's representation was matched by a statement in a written employee handbook. (Handbook at 4; *see also* Hoang Dep. (Dkt. # 56) at 11 (stating that she believed the employee handbook conferred for-cause status on City employees).) Some cases have stated, in a slightly different formulation of the rule, that oral statements *in the absence of a written policy* are insufficient to establish reliance. *See, e.g.*, *Drobny v. Boeing Co.*, 907 P.2d 299, 305 (Wash. Ct. App. 1995); *Neva v. Multi Agency Comm'ns Ctr.*, No. CV-04-0071-AAM, 2005 WL 1677530, at *4 (E.D. Wash. July 18, 2005) (same). It remains unclear whether such cases would countenance reliance on oral representations in lieu of reliance on a written policy or only in addition to reliance on a written policy. If it is the former, Ms. Baker's claim still fails for her inability to show that she was aware of the for-cause provision in the employee handbook.

879-80 (9th Cir. 1989) (finding that plaintiff failed to show reliance because he "introduced no evidence that his interpretation of the [handbook] . . . actually induced him to remain as a machinist at [the company]); *Thiel v. Rite Aid Corp.*, 115 Wash. App. 1048 (2003) (unpublished) (granting summary judgment against plaintiff because "[t]here was no testimony that he stayed with [company] because of any promises of job security" and "reliance cannot be inferred from the mere fact that an employee stays on the job with the awareness that employer policies provide some degree of job security").

To the contrary, Ms. Baker admitted that it was "doubtful" that she would have searched for another job while working for the City if she had thought she was an at-will employee. (Baker Dep. at 5.) When asked whether she stayed with the City because she thought she could only be fired for-cause, she replied: "I stayed with the City of SeaTac because I wanted to do my job and because I was working hard." (Baker Dep. at 5-6.) When asked whether she believed her job was "secure," due to the employee handbook or other representations, she answered "I don't think like that. I do my job and work hard. And I had absolutely no idea what was going on." (*Id.* at 6.) Ms. Baker also admitted that she "most likely" would have accepted employment with the City even if the employment was at-will. (Baker Dep. at 4.)

The only affirmative evidence of reliance that Ms. Baker attempts to provide is a recitation of the demands she made once the City notified her that her employment was in jeopardy. (Plf. Resp. at 12-13, citing Rosen Dec. (Dkt. # 23) Ex. 1 at 6 (email from Ms. Baker's attorney, Mr. Rosen, to Mr. Cutts asserting that Ms. Baker could only be terminated for-cause and demanding to know the nature of the City's complaints against

her).) Ms. Baker cannot bootstrap attorney arguments made on her behalf into evidence of her own previous reliance on the Handbook's statements.

Because Ms. Baker has put forth insufficient evidence showing that she relied on the written statement in the Handbook or on Ms. Hoang's oral representation (to the extent such reliance is cognizable at law) in maintaining her employment with the City, summary judgment in favor of Defendants on the the promissory estoppel exception is appropriate.

### d. Contract[7]

Policies in an employment manual can either form part of an employee's original employment contract or modify the employee contract. *Thompson*, 685 P.2d at 1087. In either situation, the plaintiff must establish the prerequisites of contract formation, offer, acceptance and consideration. *Id.* The question of whether employee handbook provisions are part of the employment contract is a question of fact. *Swanson*, 826 P.2d at 669. The analysis is "the same as that generally used to determine whether a contract has been formed: Would a reasonable person looking at the objective manifestations of the parties' intent find that they had intended this obligation to be part of the contract?" *Id.* at 670 (citing 1 L. Larson, *Unjust Dismissal* § 8.02, at 8-5 (1991)).

---

[7] Defendants argue that Ms. Baker is not entitled to rely on the contract exception to at-will employment because she did not raise this legal theory in her pleadings. (Def. Reply at 2-3.) Defendants are incorrect. A well-pleaded complaint must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Ms. Baker's complaint alleges: "At all relevant times hereto SeaTac maintained an employee handbook limiting its power to terminate employees to circumstances where it could establish the existence of 'cause.'" (Compl. ¶ 3.15.) As such, under *Twombly*, Ms. Baker's complaint adequately encompasses the contract exception, and she is entitled to rely on it now.

The Washington Supreme Court in *Gaglidari* held that a handbook given to an employee on her first day at work constituted a part of her employment contract because:

> Defendant extended plaintiff an offer by giving her the manual and explaining its provisions. Defendant accepted the offer by signing the acknowledgment form agreeing to abide by its provisions. The consideration is found in plaintiff actually working for defendant.

*Gaglidari*, 815 P.2d at 1366. The Supreme Court then held that a second manual given to the employee modified the existing employment contract because:

> Plaintiff's receipt of the handbook satisfied the requisites of contract formation. Defendant extended an offer by providing the handbook and training plaintiff . . . . Plaintiff accepted the offer by signing for the handbook and participating in the training. The consideration was plaintiff's continuation of her employment.[8]

*Id.* at 1367-68. Under this rubric, Ms. Baker's evidence raises material issues of fact as to offer, acceptance, and consideration that must be decided by a jury.

Specifically, Ms. Baker presents evidence that she received a copy of the employee handbook shortly after she was hired. (*See* Receipt; Orientation Checklist.) Ms. Baker signed a form acknowledging receipt of this handbook at the new hire orientation meeting. (Receipt.) This acknowledgment was one of the "necessary forms" that Ms. Baker's offer letter stated that Ms. Baker would be required to complete. (*See*

---

[8] Recently, lower Washington state courts have required consideration in addition to continued employment to support modification of an at-will employee contract. *See, e.g.*, *Rowe v. Vaagen Bros. Lumber, Inc.*, 996 P.2d 1103, 1108 (Wash. Ct. App. 2000) ("A true contract is created if, in exchange for the handbook promises, the worker provides consideration in addition to required services."); *Kuest v. Regent Assisted Living, Inc.*, 43 P.3d 23, 30 (Wash. Ct. App. 2002); *Winspear v. Boeing Co.*, 880 P.2d 1010, 1017 (Wash. Ct. App. 1994); *see generally Rosellini v. Banchero*, 517 P.2d 955, 958 (Wash. 1974) (en banc) (holding that, in general, modification of a contract requires consideration in addition to that promised in original contract). Absent direction from the Washington Supreme Court, this court will continue to hew to the approach set forth in *Gagliardi*.

ORDER- 20

Offer Letter.)  When discussing Ms. Baker's offer, Ms. Hoang informed Ms. Baker that SeaTac was "not an at-will city"—a belief which appears to have been predicated at least in part on the terms found in the Handbook.  (Baker Dep. at 3-4; Hoang Dep. at 11 (stating that she believed the employee handbook conferred for-cause status on City employees).)  And the City manager, Mr. Cutts, believed that Ms. Baker could only be terminated for cause—even though Ms. Baker's offer letter did not state that she was a for-cause employee.  (Cutts Dep. at 9.)  Finally, the City dismissed Ms. Baker in part for her alleged failure to adhere to the policies set forth in the employment handbook. (Termination Notice at 4 (listing Ms. Baker's alleged violations of the handbook's "standards of conduct and discipline").)

In short, this evidence raises an issue of material fact as to whether a reasonable person looking at the objective manifestations of the parties' intent could find that they had intended the obligations listed in the handbook to be part of the employee contract. *See Swanson*, 826 P.2d at 670.  Therefore, summary judgment in either party's favor is inappropriate at this stage.

### e.  Disclaimer

Defendants argue that statements sprinkled throughout the employee handbook effectively disclaim any promises that may be found in the Handbook.  (Def. Mot. at 3-4.)  Defendants rely specifically on the following statements.  "This handbook is intended to be a source of general information concerning City personnel policies and procedures." (Handbook at 3.)  "It sets out basic personnel and procedural guidelines for those of us

1  working for the City." (*Id.*) "Information contained in this handbook is subject to

2  modification from time to time by the City Manager." (*Id.*)

3       At a minimum, an effective disclaimer "must state in a conspicuous manner that

4  nothing contained in the handbook, manual, or similar document is intended to be part of

5  the employment relationship and that such statements are instead simply general

6  statements of company policy." *Swanson*, 826 P.2d at 672. Even an effective disclaimer

7  may be negated by inconsistent or contradictory employer representations and practices.

8  *Swanson*, 826 P.2d at 676. The applicability and effect of a disclaimer can be a question

9  of fact or law. *Swanson*, 826 P.2d at 677.

10       Here, the sentences found in the City's employee handbook do not rise to the level

11  of clear, conspicuous disclaimers of contractual rights that Washington courts have held

12  effective as a matter of law. *Compare Clark v. Sears Roebuck & Co.*, 41 P.3d 1230, 1231

13  (Wash. Ct. App. 2002) (affirming dismissal of claim based on disclaimer in policy

14  manual stating: "References in this Guide to reasons for termination are illustrative only

15  and are not intended to limit in any way either the reasons for which an associate may be

16  terminated or Sears' authority to terminate at will.") *and Quedado v. Boeing Co.*, 276

17  P.3d 365, 371 (Wash. Ct. App. 2012) (affirming grant of summary judgment based on

18  disclaimer stating: "This process instruction does not constitute a contract or contractual

19  obligation . . . .") *with Carlson v. Lake Chelan Cmty. Hosp.*, 75 P.3d 533, 541 (Wash. Ct.

20  App. 2003) (upholding jury verdict finding implied contract despite disclaimer stating

21  "[t]his Handbook is intended as a set of general guidelines . . . .") The court notes that

22  this language may nonetheless remain relevant to the question of whether the City's

provision of the Handbook constituted an offer to engage in or modify a binding contract with its employees. *See Payne v. Sunnyside Cmty. Hosp.*, 894 P.2d 1379, 1384 (Wash. Ct. App. 1995) (reversing summary judgment because conflicting language in a handbook raised an issue of fact as to whether the employee intended the handbook to modify the employment relationship).

**C.     Due Process**

Regarding the second element of a procedural due process claim, courts apply a balancing test to determine what procedural protections are adequate in each particular case. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). Specifically, courts consider: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge,* 424 U.S. 319, 335 (1976). As this court stated in its order denying Defendants' first motion for summary judgment, whether the procedures provided by the City satisfy due process is a legal question for the court to decide. *See* 10/22/13 Am. Ord. at 6 (*citing Walker v. City of Berkeley*, 951 F.2d 182, 184 (9th Cir. 1991)).

In the context of public employment, the Supreme Court has defined a minimum floor for pre-deprivation process: before a public employee's employment is terminated, he is entitled to "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Cleveland Bd.*

1  *of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).  In identifying this minimum floor, the

2  Supreme Court relied on the fact that state law provided the employee with a full

3  evidentiary post-termination review.  *Id.* at 548.

4      In general, the amounts of pre- and post-termination process required are relative:

5  "The general rule is that the less the pre-deprivation process, the greater must be the post-

6  deprivation process."  *Cassim v. Bowen*, 824 F.2d 791, 798 (9th Cir. 1987); *see also*

7  *Carter v. Western Reserve Psychiatric Habilitation Center*, 767 F.2d 270, 273 (6th Cir.

8  1985) ("[T]the required extent of post-termination procedures is inextricably intertwined

9  with the scope of pre-termination procedures.")  Therefore, even when pre-termination

10  proceedings are provided, a court "must also independently assess the adequacy of the

11  post-termination proceedings."  *Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321,

12  332 (9th Cir. 1995); *see also Taylor v. City of Cheney*, 11-CV-0170-TOR, 2012 WL

13  5361424, at *5 (E.D. Wash. Oct. 31, 2012).  ("[U]nder Ninth Circuit case law the Court

14  *must* independently evaluate the post-termination process for due process violations.").

15      Other circuits' assessments of the balance between pre- and post-termination

16  hearings are instructive.  For instance, the Sixth Circuit held that, if only an abbreviated

17  pre-termination hearing is provided, "due process requires that a discharged employee's

18  post-termination hearing be substantially more meaningful."  *Mitchell v. Fankhauser*, 375

19  F.3d 477, 480-81 (6th Cir. 2004).  At a minimum, this "requires that the discharged

20  employee be permitted to attend the hearing, to have the assistance of counsel, to call

21  witnesses and produce evidence on his own behalf, and to know and have an opportunity

22  to challenge the evidence against him."  *Id.* (quoting *Carter*, 767 F.2d at 273).  Similarly,

the Seventh Circuit held that a pre-termination hearing "must fully satisfy the due process requirements of confrontation and cross-examination in addition to the minimal *Loudermill* requirements of notice and an opportunity to be heard" if a public employee does not receive a post-termination hearing. *Baird v. Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 692 (7th Cir. 2004).

The parties do not dispute that the notice and hearing afforded Ms. Baker satisfy the minimal requirements of a *Loudermille* pre-termination hearing. (*See* Plf. Mot at 9.) They disagree, however, as to what additional process was due, if any. Ms. Baker argues that she was entitled to a post-termination hearing before a neutral decisionmaker that included the ability to present evidence on her own behalf and confront witnesses against her. (Plf. Mot. at 10-11). Defendants maintain that their pre-termination procedures were so exhaustive that they obviate the need for a post-termination hearing completely. (*See* Def. Resp. at 6-10.) The court already denied Defendants' motion for summary judgment that the provided procedures were adequate as a matter of law. (*See generally* 10/22/13 Am. Ord.) Because Defendants raise no new facts, much of the court's previous analysis is applicable and incorporated here. (*See* 10/22/13 Am. Ord. at 8-12.) Accordingly, applying the *Mathews* balancing test, the court finds that the City's termination deprived Ms. Baker of due process for the following reasons.[9]

//

---

[9] For purposes of this inquiry, the court assumes without deciding that Ms. Baker possessed a property interest in her employment with the City. As discussed above, the question of Ms. Baker's property interest rests on material issues of fact which must be decided by a jury. *See supra* Section III.B.

### 1. Ms. Baker's Interest in Employment

The first consideration under *Mathews* is "the private interest that will be affected by the official action." *Mathews*, 424 U.S. at 335. In the words of the Supreme Court, "the significance of the private interest in retaining employment cannot be gainsaid." *Loudermill*, 470 U.S. at 543. The interest is significant because "[w]hile a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Id.* Indeed, courts have frequently recognized the severity of depriving a person of the means of livelihood. *Id.* (collecting cases). As such, Ms. Baker's interest in retaining her employment with the City is substantial. Defendants do not dispute this point. (*See generally* Def. Resp.)

### 2. Risk of Erroneous Deprivation and Probable Value of Additional Procedure

The second consideration under *Mathews* is "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." *Mathews,* 424 U.S. at 335. Here, Defendants argue that their process was sufficient because (1) the City undertook a five-month factual investigation, (2) Ms. Baker participated in multiple interviews during the investigation, and (3) Ms. Baker had the opportunity to present rebuttal at the telephonic hearing and in two written responses. (*See generally* Def. Resp.) Defendants emphasize that, over the course of her interviews, Ms. Baker "had the opportunity to respond to most, if not all, of

the specific charges against her long before she received the pre-disciplinary notice."
(Def. Resp. at 6.)

To begin, the investigation by the City is not a basis for finding due process.  Time spent by an employer marshalling evidence against an employee is no substitute for the employee's requisite opportunity to "present his side of the story."  *See Loudermill*, 470 U.S. at 546.

Similarly, Ms. Baker's interviews are not a basis for finding due process.  The City highlights that Ms. Baker was questioned about certain specific examples of her conduct that were later relied on in the Investigation Report. (Def. Resp. at 7-9.)  The City concludes that this questioning adequately informed Ms. Baker of the accusations against her and gave her opportunity to rebut the accusations.  (*Id.*)  First, as the City admits, Ms. Baker's termination was predicated on more than just these three specific examples of conduct listed in the City's motion.  (Def. Resp. at 10.)  Second, regardless of whether Ms. Baker was invited to discuss certain incidents at her interviews, the fact remains that Ms. Baker was not informed of the specific, formal allegations against her until after the interviews had concluded and she received the Hearing Notice.  (*See, e.g.*, Baker Decl. ¶¶ 2; 12-13; Cutts Decl. ¶ 5, 9; Hearing Notice at 1 (bullet-point list of alleged misconduct and violations of City policy).)  Third, it should go without saying that there is a material difference between an extemporaneous response to an unanticipated interview question and a rebuttal prepared after time to review and consider an issue.  Due process contemplates the latter, not the former.  Indeed, Ms. Baker testifies that "[t]he questions in the interrogation were so vague that it was nearly impossible to

know what I was being asked, much less how to answer." (Baker Dec. ¶¶ 12-13.) After surveying the interview transcripts, the court agrees. (*See generally* Interviews (Dkt. ## 61-1, 61-4).) It appears that many interview "questions" consisted mainly of Ms. Hoang describing an incident that had been recounted to her by a third party; sometimes Ms. Baker had difficulty recalling the incident on the spot. (*See id.* at 1-6; *id* at 3 ("I have a vague recollection . . .").)

Lastly, the telephonic hearing and Ms. Baker's written responses, although perhaps exceeding *Loudermill*'s requirements, nonetheless engender an appreciable risk of erroneous deprivation. Ms. Baker was permitted only ten days to prepare her response to the formal charges against her (an increase from the two days the City originally budgeted). (Hearing Notice at 1; Resp. at 8.) There were no witnesses present during the telephone call, and although Ms. Baker submitted a written response explaining her disagreement with the Report, she was initially not permitted to introduce affirmative evidence. (Cutts Decl. ¶¶ 10, 11; Bartolo Decl. Ex. 1.) The City admits that it considered the written evidence that Ms. Baker later provided for less than one day before issuing the Termination Notice. (*See* Termination Notice at 2.) Mr. Cutts, the official responsible for personnel decisions, admits that he did not even read the written evidence attached to Ms. Baker's second response. (Cutts Dep. at 6-7.) The Termination Notice is little more than a word-for-word recapitulation of the Hearing Notice; it does not address Ms. Baker's arguments or evidence in any substantive way. (*Compare* Termination Notice *with* Hearing Notice.) Given this summary treatment of Ms. Baker's

response, the safeguard of a "second look" at the issues could go far to mitigating the risk of erroneous termination.

Moreover, Ms. Baker's termination was initiated due to and predicated almost entirely on complaints by other City employees.  (*See, e.g.*, Report at 7-48 ("Section III: Discussion of Specific Complaints"); Termination Notice at 2 ("I have thoroughly reviewed the City's personnel investigation into employees' complaints and/or concerns . . . ."); Cutts Dec. ¶ 2).  The City argues that, because Ms. Baker received copies of the notes of other employees' interviews at least one month before the Report issued, Ms. Baker had ample time to prepare a response to their complaints.  (Def. Resp. at 7-10, *citing* (Interview Notes (Dkt. ## 61-2; 61-3).)  However, the fact remains that at the telephonic hearing, Ms. Baker was neither permitted to cross-examine these employees nor to provide affirmative evidence (aside from her own testimony).  An opportunity for Ms. Baker to confront the witnesses against her, as well as to put forth countervailing evidence, could provide a valuable check on the accuracy of the City's decision.

### 3.  The City's Interests

The third consideration under *Mathews* is "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews,* 424 U.S. at 335.

The City does not address this prong in any of its currently pending motions.  Previously, the City argued that it has an interest in efficiently "removing a dysfunctional department head."  (1st  Def. Mot. (Dkt. # 30) at 13.)  Accepting that the Director of

Community and Economic Development is a "key" position within the City bureaucracy (Cutts Decl. ¶ 3), the court notes that this interest was lessened somewhat by the facts that Ms. Baker had already been placed on administrative leave for about three months by the time she received her pre-termination hearing (Baker Decl. ¶ 10), and that Ms. Baker, although perhaps "dysfunctional," was not being terminated for illegal, dangerous, or other more concerning behavior (*see, e.g.*, Report at 7; Hearing Notice at 1).

The City also previously argued that it has an interest in avoiding the financial and administrative burden of an additional hearing at the end of a long investigation. (1st Def. Reply (Dkt. # 37) at 2.) Although financial burden is a valid interest, the cost of the City's initial factual investigation should not be conflated with the cost of providing due process to Ms. Baker. The two are separate, and therefore, the cost of granting Ms. Baker a post-determination hearing appears no greater than that associated with the two-hearing process sanctioned by courts time and again since *Loudermill*. *See, e.g.*, *Walker*, 951 F.2d at 185; *Clement*, 69 F.3d at 334.

### 4. Post-Termination Hearing

After balancing the three *Mathews* considerations, the court finds that the procedures afforded Ms. Baker do not constitute due process. *See Walker*, 951 F.2d at 184 (determining the adequacy of provided procedures is a legal question). To the contrary, the importance of Ms. Baker's employment interest and the likelihood that additional safeguards could serve as a meaningful check on the City's termination decision outweigh the City's interest in avoiding the administrative burden associated with additional safeguards.

Other courts addressing an employer's denial of a post-termination hearing have reached similar conclusions. *See, e.g.*, *Mitchell*, 375 F.3d at 481 (reversing summary judgment because the discharged employee, despite being afforded a pre-termination hearing that defendants argued "was intended to take care of all the requirements of due process," was nonetheless entitled to a "more meaningful post-termination hearing"); *Carter*, 767 F.2d at 273 (reversing summary judgment because the employee's pre-termination hearing did not include the ability to call witnesses and present evidence, and "[t]he severity of depriving a person of the means of livelihood requires that such person have at least one opportunity for such a full hearing."); *Baird*, 389 F.3d at 693 (reversing summary judgment because defendant's self-described "generous" pre-termination procedures did not include, among other things, an effective opportunity to call and question witnesses); *Taylor*, 2012 WL 5361424, at *5 (denying summary judgment where defendant argued that the discharged employee was not entitled to a post-deprivation hearing).

Therefore, the court finds that Ms. Baker (assuming without deciding that she possessed a property interest in her employment) was entitled to a post-termination hearing that includes the assistance of counsel, as well as the ability to present evidence on her own behalf and cross-examine witnesses against her. *See, e.g.*, *Carter*, 767 F.2d at 273 ("At a minimum, [a meaningful post-termination hearing] requires that the discharged employee be permitted to attend the hearing, to have the assistance of counsel, to call witnesses and produce evidence on his own behalf, and to know and have an opportunity to challenge the evidence against him.")

**D.  Qualified Immunity**

The principles of qualified immunity "shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The Supreme Court has established a two-step sequence for resolving government official's qualified immunity claims. *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  First, a court must decide whether the facts that a plaintiff has shown make out a violation of a constitutional right.  *Id.*  Second, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  *Id.*

Courts may exercise discretion in deciding the order in which to address the two prongs.  *Pearson*, 555 U.S. at 242.  Because questions of fact regarding Ms. Baker's potential property interest in her employment remain, the court will address the second prong first.  The court finds that, assuming that Ms. Baker possessed a property interest in her employment, her right to additional process was not "clearly established" within the meaning of *Pearson v. Callahan*.

The inquiry into whether a constitutional right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.  In this case, Ms. Baker's right to due process turns on, according to Washington state law, the interpretation of an employee handbook issued by the City.   This court, finding the Handbook's provision to be ambiguous, ultimately construed the ambiguity against the City.  (*See supra* Section III.D.1.)   Operating without the benefit of the court's ruling on this matter, Mr. Cutts acted in good faith in

denying Ms. Baker additional process. *See Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992) ("Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") Mr. Cutts' reliance on the advice of counsel is further indication of his good faith. (*See* Dkt. # 36-1 (correspondence from City Attorney Ms. Bartolo discussing post-termination hearing)); *Dixon v. Wallowa Cnty.*, 336 F.3d 1013, 1019 (9th Cir. 2003) ("[R]eliance on an attorney's advice is some evidence of good faith.")

The doctrine of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Mr. Cutts fits neither category. Consequently, the court grants Defendants' motion for qualified immunity and dismisses Mr. Cutts in his individual capacity with respect to the §1983 cause of action.[10]

Ms. Baker's complaint also names Mr. Cutts in his official capacity. (*See* Compl. at 1.) In the context of a §1983 claim, "[a]n official capacity suit against a municipal officer is equivalent to a suit against the entity." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). "When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant defendant." *Id.* (upholding dismissal of redundant defendant); *see also Vance v. Cnty. of Santa Clara*,

---

[10] Federal qualified immunity does not apply to pendant state law claims. *Finkelstein v. Bergna*, 924 F.2d 1449, 1452 (9th Cir. 1991). Accordingly, Mr. Cutts is not dismissed from the suit to the extent Ms. Baker's wrongful termination claim under Washington state law applies to him.

928 F. Supp. 993, 996 (N.D. Cal. 1996) (dismissing law enforcement officers as redundant defendants where municipality had also been sued). Consequently, the court also dismisses Mr. Cutts in his official capacity with respect to the §1983 cause of action.

## IV. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part Defendants' motion for summary judgment (Dkt. # 50) and grants in part and denies in part Plaintiff's motion for summary judgment (Dkt. # 53).

Dated this 13th day of January, 2014.

JAMES L. ROBART
United States District Judge